**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) |
| | ) NO. 20CR30017-MGM |
| **ROSS LOPATA** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

## <u>DEFENDANT'S MOTION FOR PRETRIAL RELEASE</u>

Defendant ROSS LOPATA, by his attorney, respectfully requests that

this Court release him on bond pursuant to the Bail Reform Act, 18 U.S.C. § 3142 and

*United States v. Salerno*, 481 U.S. 739 (1987). ROSS LOPATA has rebutted the presumption of

detention with evidence that he has family support with a stable housing situation and the

ability to obtain and maintain employment, the motivation to deal with his substance about

issues, a limited criminal history and a history of appearing for court appearances. In support,

ROSS LOPATA states as follows:

**I.     The Statutory Presumptions of Detention Should Be Viewed with Caution
        Because They Lead to High Rates of Detention for Low-Risk Defendants.**

Congress enacted the statutory presumptions of detention in the Bail Reform Act of

1984 (BRA) "to detain high-risk defendants who were likely to pose a significant risk of

danger to the community if they were released pending trial."[1] But the presumptions of

detention have not worked as intended, and federal pretrial detention rates have skyrocketed

---

[1] Amaryllis Austin, The Presumption for Detention Statute's Relationship to Release Rates, 81 FED. PROB. 52, 56–57 (2017), archived at https://perma.cc/9HGU-MN2B.

since the BRA was enacted, rising from 19% in 1985 to 75% in 2019. [2] A recent study by the

Administrative Office of the Courts (AO) attributed this "massive increase" [3] in detention

rates to the presumptions of detention, especially as they are applied to low-risk defendants. [4]

The statutory presumptions in drug and firearm cases applied to nearly half of all federal cases

each year. [5] The presumptions of detention have thus become "an almost de facto detention

order for almost half of all federal cases." [6]

   The study further found that the presumptions increase the detention rate without

advancing community safety. Rather than jailing the worst of the worst, the presumptions

over- incarcerate the lowest-risk offenders in the system, people who are stable, employed,

educated, and have minimal to no criminal history. [7] When a low-risk individual is not facing a

presumption, they're released 94% of the time. [8] Yet an identically low-risk individual in a

presumption case is released just 68% of the time. [9] Recent testimony before Congress relied

on this government study to call for reform: "These presumptions must be changed because

they've had far-reaching and devastating consequences that were unforeseen and unintended

by Congress." [10] Moreover, "[t]he BRA's legislative history demonstrates that Congress did

---

[2] Pretrial Release and Detention: The Bail Reform Act of 1984, Bureau of Just. Stat. Special Rep., at 2 (Feb. 1988), https://www.bjs.gov/content/pub/pdf/prd-bra84.pdf (Table 1) (18.8% of defendants detained pretrial in 1985); Judicial Business: Federal Pretrial Services Tables, Admin. Off. U.S. Courts ("AO Table"), Table H-14 (Sept. 30, 2019) https://www.uscourts.gov/sites/default/files/data_tables/jb_h14_0930.2019.pdf (74.8% of defendants detained pretrial in 2019); see also AO Table H-14A (Sept. 30, 2019), https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf (61% detention rate excluding immigration cases).

[3] Austin, supra note 1, at 61

[4] *Id.* at 57.

[5] *Id.* at 55 (the drug presumption "applied to between 42 and 45 percent of [all federal] cases every year").

[6] *Id.* at 61.

[7] *Id.* at 57.

[8] *Id.*

[9] *Id.*

[10] See The Administration of Bail by State and Federal Courts: A Call for Reform: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. (2019), https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2256; Testimony of Alison Siegler at PDF 6–7 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-TTF-SieglerA-

not intend the drug presumption to apply so broadly," and only intended it to apply to "major drug traffickers," not people like Mr. Lopata.[11]

The problems with the statutory presumptions of detention are important to Mr. Lopata's motion because, as the AO study confirms, high federal pretrial detention rates come with significant and wide-ranging "social and economic costs."[12] For example, the study explains that "[e]very day that a defendant remains in custody, he or she may lose employment which in turn may lead to a loss of housing. These financial pressures may create a loss of community ties, and ultimately push a defendant towards relapse and/or new criminal activity."[13] Indeed, the economic harms stemming from being detained pretrial persist for years: even three to four years after their bail hearing, people released pretrial were still 24.9% more likely to be employed than those who were detained.[14] And these harms are not just limited to the detained person—once someone is incarcerated, the odds that his children become homeless increase by 95%, and the odds that his partner becomes homeless increase by 49%.[15] The other emotional and psychological harms visited upon the children of

20191114.pdf; see also Written Statement of Alison Siegler at 13–17 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-Wstate-SieglerA- 20191114.pdf (calling for the complete elimination of the presumptions in drug and gun cases).

[11] Erica Zunkel & Alison Siegler, The Federal Judiciary's Role in Drug Law Reform in an Era of Congressional Dysfunction, 18 Ohio St. J. Crim. L. (forthcoming 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3589862, PDF at 7–9 (analyzing legislative history of presumptions in detail).

[12] Austin, supra note 1, at 61.

[13] Id. at 53; see also Alexander M. Holsinger & Kristi Holsinger, Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes, 82(2) Fed. Prob. 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83 (finding that for people detained pretrial for at least three days, 76.1% had a negative job-related consequence and 37.2% had an increase in residential instability).

[14] Will Dobbie et al., The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges, 108(2) Amer. Econ. Rev. 201, 204 (2018), archived at https://perma.cc/X77W-DAWV.

[15] For children, Christopher Wildeman, Parental Incarceration, Child Homelessness, and the Invisible Consequences of Mass Imprisonment, 651 The Annals of the American Academy of Political and Social Science 74, 88 (2014); for partners, see Amanda Geller & Allyson Walker Franklin, Paternal Incarceration and the Housing Security of Urban Mothers, 76 J. Fam. & Marriage 411, 420 (2014).

incarcerated parents are well- documented.[16]

It is unsurprising, then, that another AO study found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[17] More recent studies have confirmed that pretrial detention is criminogenic[18] and cautioned that "lower crime rates should not be tallied as a benefit of pretrial detention."[19] One reason why pretrial detention is criminogenic is because jails' physical and mental health screenings and treatment offerings are often inadequate.[20] In addition, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[21] These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[22]  In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, in a

---

[16] *See, e.g.,* Joseph Murray et al., Children's Antisocial Behavior, Mental Health, Drug Use, and Educational Performance After Parental Incarceration: A Systematic Review and Meta-Analysis, 138(2) Psychological Bulletin 175, 186 (2012).

[17] Austin, supra note 1, at 54 (citing Christopher T. Lowenkamp et al., Investigating the Impact of Pretrial Detention on Sentencing Outcomes (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).

[18] Paul Heaton et al., The Downstream Consequences of Misdemeanor Pretrial Detention, 69 Stan. L. Rev. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic effects."); Arpit Gupta et al., The Heavy Costs of High Bail: Evidence from Judge Randomization, 45 J. Legal Stud. 471, 496 (2016) ("[O]ur results suggest that the assessment of money bail yields substantial negative externalities in terms of additional crime.").

[19] Emily Leslie & Nolan G. Pope, The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments, 60 J.L. & Econ. 529, 555 (2017).

[20] See Laura M. Maruschak et al., Medical Problems of State and Federal Prisoners and Jail Inmates, Bureau of Just. Stat., at 9 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); see also Faye S. Taxman et al., Drug Treatment Services for Adult Offenders: The State of the State, 32 J. Substance Abuse Treatment 239, 247, 249 (2007), archived at https://perma.cc/G55Z-4KQH

[21] James C. Oleson et al., The Sentencing Consequences of Federal Pretrial Supervision, 63 Crime & Delinquency 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.

[22] Thomas H. Cohen et al., Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary, 82(2) Fed. Prob. 23, 26 (2018), archived at https://perma.cc/8VM9-JH9T.

counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place.

There are also significant fiscal costs associated with high federal pretrial detention rates. As of 2016, the average pretrial detention period was 255 days (although several districts averaged over 400 days in pretrial detention).[23] Pretrial detention costs an average of $73 per day per detainee, while pretrial supervision costs an average of just $7 per day.[24]

## II.     MR. LOPATA Should Be Released on Bond with Conditions.

In this case, the statute creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e)(3). However, release is warranted here because there are numerous facts under § 3142(g) that rebut the presumption of detention and demonstrate that there are conditions of release that will reasonably assure both MR. LOPATA's appearance in court and the safety of the community.

As the Supreme Court held in *Salerno*, "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." 481 U.S. at 755. This presumption of release is encapsulated in the BRA, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further condition[s]" that will "reasonably assure" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be

---

[23] Austin, supra note 1, at 53.
[24] *Id.* Thus, 255 days of pretrial detention would cost taxpayers an average of $18,615 per detainee, while pretrial supervision for the same time would cost an average of $1,785.

detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S.

Rep. No. 98-225, at 7 (1984), as reprinted in 1984 U.S.C.C.A.N. 3182, 3189); see also *United*

*States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly

favors nondetention.").

## III.    The Presumption of Detention Can Be Easily Rebutted and, Once Rebutted, Must Be Considered Alongside All of the Evidence That Weighs in Favor of Release.

The law is clear that (1) very little is required for a defendant to rebut the presumption,

and (2) courts must weigh the rebutted presumption against every factor that militates in favor

of release before detaining a defendant. In addition, it is impermissible to detain a defendant in

a presumption case based solely on evidence of past dangerousness, the nature of the crime

charged, or the weight of the evidence.

### A.    Rebutting the Presumption

Very little is required for a defendant to rebut the presumption of detention. A

defendant simply needs to produce "some evidence that he will not flee or endanger the

community if released." *Dominguez*, 783 F.2d at 707; see also *United States v. Jessup*, 757

F.2d 378, 384 (1st Cir. 1985), abrogated on other grounds by *United States v. O'Brien*, 895

F.2d 810 (1st Cir. 1990) ("[T]o rebut the presumption, the defendant must produce some

evidence."); *United States v. Gamble*, No. 20-3009, 2020 U.S. App. LEXIS 11558 at *1–2

(D.C. Cir. Apr. 10, 2020) (holding that "[t]he district court erred in concluding that appellant

failed to meet his burden of production to rebut the statutory presumption" regarding

dangerousness because "appellant did 'offer some credible evidence contrary to the statutory

presumption,'" including information that he had a job offer) (unpublished) (quoting *United*

*States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)). This "burden of production is not a

heavy one to meet." *Dominguez*, 783 F.2d at 707.

Indeed, the presumption of detention is rebutted by "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." Id. (emphasis added); *Jessup*, 757 F.2d at 384. Any "evidence of economic and social stability" can rebut the presumption. *Dominguez*, 783 F.2d at 707. As long as a defendant "come[s] forward with some evidence" pursuant to § 3142(g), the presumption of flight risk and dangerousness is definitively rebutted. Id. ("Once this burden of production is met, the presumption is 'rebutted.'") (quoting *Jessup*, 757 F.2d at 384); see also *O'Brien*, 895 F.2d at 816 (finding presumption of flight risk rebutted by evidence of effectiveness of electronic monitoring ankle bracelet together with posting of defendant's home).[25] The government bears the burden of persuasion at all times. Id.; *Jessup*, 757 F.2d at 384; *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

In *Dominguez*, for example, the Seventh Circuit determined that the defendants had sufficiently rebutted the presumption of detention by introducing fairly minimal evidence about their employment and family ties. 783 F.2d at 707. Both defendants were Cuban immigrants who were not U.S. citizens but had been in the country lawfully for five years, and neither had a criminal record. Id. One of the defendants was married and had family members in the United States; both were employed. Id. These facts alone were sufficient for the Seventh Circuit to find that defendants had rebutted the presumption. Id.

B.    **Weighing the Rebutted Presumption**

---

[25] To rebut the presumption of flight risk, for example, a defendant does not "have to prove that he would not flee—i.e., he would [not] have to persuade the judicial officer on the point. [Instead], he would only have to introduce a certain amount of evidence contrary to the presumed fact." Jessup, 757 F.2d at 380–81; accord Dominguez, 783 F.2d at 707.

After the presumption is rebutted, the Court must weigh the presumption against all of the other evidence about the defendant's history and characteristics that tilts the scale in favor of release. *See Dominguez*, 783 F.2d at 707 ("[T]he rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."); *Jessup*, 757 F.2d at 384 (holding that the judge should consider the rebutted presumption along with the § 3142(g) factors). The Court should not give the presumption undue weight if evidence relating to other § 3142(g) factors supports release.

### C.     Forbidden Considerations in a Presumption Case

A judge may not detain a defendant in a presumption case based solely on (1) evidence of past dangerousness, (2) the nature and seriousness of the crime charged, or (3) the weight of the evidence against him. First, even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." *Dominguez*, 783 F.2d at 707. Even when a defendant is charged with a serious crime or has a significant criminal history, there may be release conditions that will reasonably assure the safety of the community. *Id*. Second, to rebut the presumption of dangerousness, a defendant need not "demonstrate that narcotics trafficking [or another serious crime] is not dangerous to the community." *Id.* at 706. Instead, this Court must analyze the defendant's individual characteristics under § 3142(g). Third, the Court is forbidden from relying solely on the weight of the evidence to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged." *Id.*

**IV.     The Presumption of Detention Is Rebutted in This Case.**

As detailed below, there is more than "some evidence that ROSS LOPATA will

not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707.

Accordingly, the presumption is rebutted in this case.

Community Ties

ROSS LOPATA has presented evidence that he was born in Springfield and has

lived all his adult life in the Springfield area.  For the past four years prior to his arrest,

he lived at 28 Allison Lane, Springfield, Massachusetts with his significant other and his

two minor children.[26]

Family Ties

Mr. Lopata's mother lives in Springfield. He has as an uncle who resides in

Ludlow.

Employment History

Up to the time of the COVID-19 pandemic, he had been employed for most of the

past ten years as a delivery person for Dominoes Pizza in Springfield.

Criminal History

ROSS LOPATA does have a criminal history although he has no recent criminal

history. His record shows convictions for assault, violation of an abuse prevention order

and carrying a dangerous weapon. However, those convictions are nearly ten years old. It

appears that Mr. Lopata completed any probation conditions without violating the terms

of the probation. A set of convictions related to a drug crime from 2009 were dismissed in

---

[26] Based upon information received by the probation office and a telephone conversation with the mother of Mr.
Lopata's children, Mr. Lopata is no longer welcome back to the Allison Lane address. As a result, Mr. Lopata is
requesting that he be released to live with his uncle who resides in Las Vegas, Nevada.

2018.

History of Court Defaults

One default warrant appears on Lopata's record, but that default goes back to June 2019. There was a warrant issued on a traffic matter in Springfield District Court, but that warrant was cleared up two weeks after the warrant issued and the case was dismissed on the same day.

Substance Abuse History

As noted by the Probation Office, Mr. Lopata does have a substance abuse issue based upon an addiction to pain medication. At the time of the offense, Mr. Lopata had voluntarily enrolled in a methadone treatment program at Habit Opco in Springfield, Massachusetts and had been participating in that program up to the time of his arrest on these charges.

Section 3142(g)(3)(B) Consideration

Mr. Lopata was not on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

The foregoing facts definitively rebut the presumption of detention in this case.

**VI.   Regardless of the Presumption, MR. LOPATA Must Be Released Because There are Conditions That Will Reasonably Assure Appearance and Safety.**

Regardless of whether this Court finds that the presumption of detention is rebutted, ROSS LOPATA must be released because there are conditions that will reasonably assure the safety of the community and ROSS LOPATA's appearance in court. A defendant cannot be detained "unless a finding is made that no release conditions '*will* reasonably assure . . . the safety of the community'" and the defendant's appearance in court. *Dominguez*, 783 F.2d at

707 (quoting § 3142(e)). Here, the government has not carried its high burden of proving by clear and convincing evidence that there are *no* release conditions that will reasonably assure the safety of the community. *See id.* at 708 n.8. The government also has not proved by a preponderance of the evidence that there are no conditions that would reasonably assure ROSS LOPATA's appearance in court. Thus, ROSS LOPATA cannot be detained.

The following conditions of release under § 3142(c)(1)(B), and any other conditions the Court deems necessary, will reasonably assure ROSS LOPATA's appearance in court and the safety of the community:

- Place ROSS LOPATA in custody of his uncle, ANDREW LOPATA "who agrees to assume supervision and to report any violation of a release condition to the court." [§ 3142(c)(1)(B)(i)]
- Maintain or actively seek employment [(ii)]
- Report on a "regular basis" to PTS or some other agency [(vi)]
- Comply with a curfew [(vii)]
- Refrain from possessing "a firearm, destructive device, or other dangerous weapon" [(viii)]
- Refrain from "excessive use of alcohol" [(ix)]
- Refrain from "any use of a narcotic drug or other controlled substance . . . without a prescription" [(ix)]
- Undergo medical, psychological, or psychiatric treatment, including treatment for drug dependency [(x)]
- Not possess, obtain, or view sexually explicit material as defined by Title 18 USC 2256(2)(A-E) and any adult pornography [(xiv)]
- Not directly or indirectly use or possess a computer or electronic media, including PDA (personal digital assistant) and cellular phones, with internet access capabilities or access a computer or electronic media, without the prior approval of Pretrial Services. Defendant shall also not access internet bulletin board systems, or private or public computer networks without prior approval of Pretrial Services. [(xiv)]
- Permit Pretrial Services to install monitoring software on any computer within the defendant's possession or control that allows random or regular monitoring of the defendant's computer use. Pretrial Services will also be allowed periodic inspection of any such computer including retrieval, copying and review of its electronic contents. [(xiv)]
- Not have direct or indirect contact with persons under the age of 18. [(xiv)]
- Not affiliate with, own, control, and/or be employed in any capacity by a business, organization, and or volunteer activity that causes the defendant to

regularly contact persons under the age of 18. [(xiv)]
- Not frequent places primarily used by persons under the age of 18 without the prior approval of Pretrial Services, including but no limited to, public libraries. [(xiv)]
- Any other condition  that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." [(xiv)]

Andrew Lopata is Mr. Lopata's uncle and one of his closest relatives. He lives by himself in Las Vegas, Nevada. He has resided in Las Vegas for the past 11 years. He owns his own home and has offered to have Mr. Lopata live with him should the Court release him. Although Las Vegas is a significant distance from this district, Andrew Lopata represents that he will make sure that ROSS LOPATA will attend any court hearings where his physical presence is required. Due to the present COVID-19 pandemic, it appears unlikely that Mr. Lopata will be required to appear physically in the court in the future.

With respect to continued substance abuse treatment options in the District of Nevada, Mr. Lopata agrees to attend whatever type of treatment options are specified by the Probation Office in the District of Nevada. In addition, Mr. Lopata's uncle has identified a methadone treatment program in Las Vegas (Mission Treatment Center of Las Vegas) which he may attend upon his arrival in the District of Nevada. Mr. Lopata is already registered with the center and his uncle has offered to pay for methadone treatments should he be released until Mr. Lopata has the financial ability to pay for the treatment on his own.

Because there are conditions of release that will reasonably assure ROSS LOPATA'S appearance in court and the safety of the community, he should be released.

**VI.    Statistics Showing that It Is Extraordinarily Rare for Defendants on Bond to Flee or Recidivate Further Demonstrate that the Foregoing Conditions of Release Will Reasonably Assure Appearance and Safety.**

It is not necessary to detain ROSS LOPATA to meet the primary goals of the BRA, which are to reasonably assure appearance in court and community safety. In this case, this Court should be guided by AO statistics showing that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2019, 99% of released federal defendants nationwide appeared for court as required and 98% did not commit new crimes on bond.[27]

Moreover, when release rates increase, crime and flight do not. A near-perfect compliance rate on bond is seen equally in federal districts with very high release rates and those with very low release rates.[28] Even in districts that release two-thirds of all federal defendants on bond, fewer than 1% fail to appear in court and 2% are rearrested while released.[29]

The bond statistics for this district likewise strongly suggest that ROSS LOPATA should be released. In this district, released federal defendants appeared 99% of the time in 2019, and less 2% of defendants were rearrested on release. *See* App. 1, AO Table H-15. Yet despite the statistically low risk of flight and recidivism that defendants like ROSS LOPATA pose, the government recommends detention in 77% of cases nationwide and in 58% of cases in

---

[27] App. 1, AO Table H-15 (Dec. 31, 2019), available at Mot. for Bond, United States v. Rodriguez, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

[28] The data showing near-perfect compliance on bond is illustrated in the chart, "Federal Clients on Bond Rarely Flee or Recidivate." The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending December 31, 2019. See App. 2, AO Table H-14A (Dec. 31, 2019), https://perma.cc/32XF-2S42. The failure-to-appear and rearrest rates for these districts were calculated using App 1, AO Table H-15. With regard to flight, the ten federal districts with the lowest release rates (average 26.00%) have an average failure-to-appear rate of 1.37%, while the ten districts with the highest release rates (average 65.58%) have an even lower failure-to-appear rate of 0.87%. See App. 1; App. 2. With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 1.19%, while the ten districts with the highest release rates have an average rearrest rate of 2.29%. See App. 1; App. 2. The districts with the lowest release rates are, from lowest to highest, S.D. California, W.D. Arkansas, E.D. Tennessee, S.D. Texas, E.D. Missouri, N.D. Indiana, E.D. Oklahoma, W.D. Texas, W.D. North Carolina, C.D. Illinois; the districts with the highest release rates are, from lowest to highest, E.D. Michigan, E.D. Arkansas, D. New Jersey, E.D. New York, D. Maine, D. Connecticut, W.D. New York, W.D. Washington, D. Guam, D. Northern Mariana Islands. See App. 2.

[29] *See* App. 1; App. 2.

this district. *See* App. 3, AO Table H-3. Clearly the government's detention requests are not tailored to the low risk of flight and recidivism that defendants in this district and elsewhere pose.

ROSS LOPATA must be released because the government has not established that he would be among the approximately 1% of defendants who fail to appear in court or the 2% who are rearrested on bond. Detaining ROSS LOPATA without such evidence violates their constitutionally protected liberty interest.

**III.    Conclusion**

For these reasons, ROSS LOPATA respectfully requests that this Court find that the presumption has been rebutted and release him with conditions.

July 3, 2020

Respectfully submitted,

ROSS LOPATA

/s/ William J. O'Neil
WILLIAM J. O'NEIL
Attorney for the Defendant
280 N. Main St., Ste. 6
East Longmeadow, MA 01028
(413) 224-2694
BBO#:548445

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

July 3, 2020                           /s/ *William J. O'Neil*
                                       William J. O'Neil