UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) NO. 20-cr-30017-MGM |
| ROSS LOPATA | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**DEFENDANT'S SENTENCING MEMORANDUM REQUESTING
A NON-GUIDELINE SENTENCE**

**INTRODUCTION**

An extreme sense of loss hovers over the case of Ross Lopata. He comes before the Court knowing that he will lose his freedom for a significant period of time. But his loss of freedom is not the only loss that he has suffered since he was charged with these offenses. He lost his partner and mother of his children to a drug overdose while he awaited disposition on the charges. He lost contact with his sons, Carter and Lincoln, and will not contribute to his sons' formative years. For the boys, they have lost both parents within a year. Yet despite the loss of those closest to him, Mr. Lopata enjoys the unwavering support of his two uncles. Unlike many defendants who appear in this Court, he knows he has a place to go upon his release and the opportunity to start over with people in his corner. He comes before the Court with the shame that follows from his crimes but is determined to make himself a better person upon imposition of the sentence in his case. He respectfully requests that the Court impose the 60 month sentence the parties jointly request pursuant to their plea agreement.

## ROSS LOPATA'S CHILDHOOD

Mr. Lopata's early childhood life was happy and secure. Despite the fact that his father abandoned him at an early age, his mother raised Ross in the loving environment of her parents' home in Ludlow. Ross was especially close with his grandparents. Ross' uncle, Andrew Lopata, remembers that Ross' grandparents loved and adored him, providing him the best upbringing possible. Even when Ross and his mother left his grandparents' home, he still saw them just about every day and the provided him with unconditional love. The bond between him and his grandparents was the primary reason Ross had a great childhood. (PSR ¶44)

Mr. Lopata witnessed great change in his life when he reached his teen years. Unfortunately, that change was for the worst. First, he lost both of his grandparents within a year of each other. Their absence was very hard on Ross. His home life with his mother and her new husband was difficult. He describes them as arguing constantly and the arguments sometimes turned to violence. Mr. Lopata's stepfather left the household. At that point, Ross' mother began to abuse medication and alcohol. According to Ross' Uncle Andrew, he sank into a deep depression.

Another uncle, Thomas Lopata, describes the family deterioration in more specific terms. He points to age 16 as a changing point in Ross' life. At that time, both grandparents died. Ross' mother and stepfather became alcoholics and opiate addicts. At that time, Ross began to withdraw from the family as his mother and stepfather engaged in increasingly worse behavior. He ascribes the parents' addiction leading them become violent with each other and resulting in both being bad influences on Ross. (PSR ¶51)

Following his arrest on these charges, Mr. Lopata was hit with yet another tragedy. Katherine Oski, his partner and mother of his two young sons, Carter and Lincoln, died as a

result of an overdose in August 2020. The boys were now without a mother and a father. Presently, the boys live with Katherine's sister. Ross has had not contact with the boys since his arrest. At this time, it is uncertain whether a reunification will occur.

### **MENTAL HEALTH AND SUBSTANCE ABUSE HISTORY AND TREATMENT**

To ease the pain of the loss of his grandparents as well as the emotional distress he witnessed in his mother's home, Mr. Lopata was prescribed Vicodin. He broke his ankle and was prescribed painkillers. When those prescriptions ran out, Mr. Lopata turned to street drugs. Then he found that heroin was easier and cheaper to obtain. His mother was not able to help Mr. Lopata beat drugs. In fact, according to his uncle, Andrew, she and her ex-husband were the direct cause of Ross's use of opioids and other drugs. Their home environment was not a healthy one for a young man.  As an illustration of Ross being in the worst possible place to combat his addiction, his uncle recounts how Ross' mother used Mr. Lopata's knowledge in technology as a way of obtaining more drugs to satisfy her habit. This led to charges being lodged in state court for uttering a false prescription. According to his Uncle Thomas, Ross' mother likely was behind the scheme that led to his arrest. (PSR ¶51)

At the time of this offense, Mr. Lopata was trying to deal with his substance abuse issues. He attended an inpatient detox then was treated with suboxone. He relapsed frequently. After his arrest, he was detained at the Hampden County House of Correction where he was treated with methadone. Mr. Lopata has been tapering off the methadone regimen as he prepares for his eventual transfer to the Bureau of Prisons.

Leo Keating, a social worker who has spent the past twenty years evaluating sexual offenders indicates that testing disclosed that Mr. Lopata has a severe substance abuse problem which was undiagnosed throughout his adult life.  There were several factors leading to his

pornography use. They are 1) he began viewing pornography from an early age. He continued to view such pornographic images throughout his life; 2) he has abused drugs for most of his adult life and has battled addiction for all of those years. The drug use and the resulting altered mental state has contributed to this crime; and 3) he has suffered from depression for almost all of his life. His addictive behaviors with drugs and pornography were a means of coping with his depression.

Despite his longstanding depression, Mr. Lopata had not received any mental health treatment for years prior to his arrest. He was in a bad state of mind at the time of his arrest. His first long term treatment has taken place while detained at the Hampden County House of Correction. Mental health treatment providers at the facility diagnosed Mr. Lopata with 1) Rule out PTSD and 2) Opiate, Alcohol and Cocaine Use Disorder. He has been prescribed Clonidine, Vistaril, Prozac, and Trazadone. According to his treatment providers at the jail, Mr. Lopata engages willingly and openly during his sessions and his medication has helped him better manage some of his symptoms of anxiety and depression. He occasionally experiences drug cravings but feels he is better suited to deal with those cravings by seeking help from family members and health care professionals. This experience has helped him face his demons.

## **FAMILY SUPPORT**

Unlike many defendants who appear before the Court without the family support network to help them manage their eventual release and hoped for recovery, Mr. Lopata has the solid support of his two uncles. His uncle, Andrew Lopata, has resided in Las Vegas for many years. From the beginning of this case, Andrew has displayed his unwavering support for his nephew. He has attended almost all of his virtual court hearings. Had the Court been willing to release Mr. Lopata, he most certainly would have lived in Las Vegas with his uncle.

Andrew Lopata has submitted a letter in support of his nephew. He writes: "I care a lot about Ross and want him to learn from his mistakes. I truly believe he was not in his right mind at the time and drugs played a significant role in his actions. I believe in second chances and that everyone has the chance to rehabilitate themselves through honest, self-introspection and qualified therapy." Andrew has extended an open-ended invitation to Ross to live with him in Nevada. He described Las Vegas as a suitable place for those seeking second chances.

Thomas Lopata resides in Ludlow and has also offered Mr. Lopata the opportunity to reside with him upon his release. He sees Ross as a son of his own and will provide whatever assistance he can for his nephew.

## **THE ADVISORY SENTENCING RANGE IS SIGNIFICANTLY FLAWED - OVERSTATES SERIOUSNESS**

Although correctly calculated by the probation department, the sentencing guideline recommendation plainly overstates the seriousness of Mr. Lopata's conduct. The guideline calculation here suffers from the well identified shortcomings of the sentencing guideline sections for sex offenses (see infra). That does not mean that his conduct was not serious, it simply means that guidelines recommend a sentence in excess of what is necessary to promote the purposes of sentencing under 18 U.S.C. § 3553(a). The recommended guideline sentence of 121 to 151 months in prison (PSR ¶ 62), therefore, is unreasonable.

### **Computer Use Enhancement**

The enhancement for the use of a computer is unreasonable (PSR ¶22). Although an aggravating fact in 1995, virtually every child pornography case today includes the use of a computer. United States Sentencing Commission, 2012 Report to Congress: Child Pornography Offenses, at 316 (for example, computer use enhancement applies in over 96% of cases in 2010)

("USSC 2012 Report"). The presence of a computer is not novel in 2021. Computer use is the normal situation. The court should wholly disregard this enhancement because the 1995 aggravating exception has become the 2021 rule.

### **Images Possessed Enhancement**

The recommended sentencing range also contains a five-level enhancement for the number of images possessed (PSR ¶23). Again, this enhancement applies in virtually every child pornography case today. USSC 2012 Report, at 316 (number of images enhancement applies in over 96% of cases in 2010). At one time, the possession of 600 images indicated a high level of culpability given the scarcity of the content. It should be plain to the Court now, however, that the enhancement for number of images has very little to do with a defendant's culpability. Collecting images from the internet is not difficult, complicated, or time consuming, and amassing enough images to be subject to a five-level sentencing enhancement now is far easier than it was to acquire 10 "items" of child pornography in 1992. The relative ease therefore presents an argument for a lessening of culpability, rather than any increase. As the typical circumstance in these cases, the number of images should not result in an enhancement to the guidelines assessment. The standard circumstance is well covered by the appropriate base offense level. The Court should not give this enhancement any consideration.

### **Guidelines not tied to Institutional Study or Practice**

In support of the agreed upon below guidelines sentence, Mr. Lopata asks the Court to consider that the sex offense sentencing guidelines were not promulgated or developed by the Sentencing Commission in its envisioned characteristic institutional role. There is no study of sentencing efficacy or rehabilitation efforts forming a foundation for these guidelines. They were created in an office, or perhaps a conference room, rather than in a courtroom. They are founded

on congressional policy directives based on morality judgments, rather than created by practitioners or through the Sentencing Commission's study of sentencing practices. Guidelines based on policy alone are therefore worthy of less respect and consideration from the Court. *Kimbrough v. United States*, 552 U.S. 85, 100-02 (2007). In this instance the Court ought to give the advisory guideline range little to no serious consideration.

Mr. Lopata's advisory range is 121 to 151 months in custody; roughly 10 to 12 years. That range is based on the inclusion of enhancements for typical conduct – 2 levels for computer use and 5 levels for the number of images. Absent those enhancements his range would be 57 to 71 months in custody which is within the range of the agreed upon sentence in the plea agreement.

### Additional Punishment

Mr. Lopata will bear other significant punishments in addition to prison because of this conviction. First, his placement within the BOP will be limited due to his offense. He will not be afforded the opportunity to participate in programs which grant extra good time or privileges due to his offense. He may be subject to a period of civil commitment by the government after he completes this criminal sentence. He will always be a target for other inmates within the BOP because he is a sex offender. In addition, with the onset of the COVID-19 pandemic, his ability to participate in available programs due to BOP restrictions which direct social distancing between inmates and staff.

Second, He will be subject to a longer and more rigorous period of supervised release. He will receive 5 years supervised release based upon the plea agreement. He will be required to engage in sex offender treatment. He will be subjected to polygraph testing. He will be subject to searches by law enforcement with less than probable cause. His supervision will be intensive.

Third, upon his release, Mr. Lopata will most likely be responsible for some of the victims identified as a result of his behavior. As of this date, he is aware of approximately five restitution claims made in this case. The exact nature of the claims is unknown to him at this time and the amount of restitution has yet to be established but there is a strong likelihood of restitution being made a part of the judgment against him.

Lastly, Mr. Lopata will be declared and labeled a sex offender. He will be required to register with authorities where he lives, works, or attends school. Some jurisdictions will require his registration for the rest of his life. His housing will always be limited. His employment – if he can find work – will always be limited. His travel will always be limited. He will be a second-class citizen.

### A Minimally Sufficient Sentence

The law directs the Court to impose a sentence which is the least restrictive means to affect the purposes of sentencing, including just punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a) (the parsimony directive). Mr. Lopata has already begun to address his behavior issues which had never been addressed prior to his arrest. The agreed upon sentence recommendation period in custody will be sufficient to continue his treatment and prepare for his eventual release. The guideline range, however, is patently unreasonable. The agreed sentence requested reflects a reasonable sentence and will adequately promote the purposes of sentencing in this case under § 3553(a), while not being more severe than necessary. For all these reasons Mr. Lopata requests the Court follow the agreed recommendation and sentence him accordingly. Mr. Lopata respectfully requests that the Court recommend that his sentence be served at **FMC Devens** where he will be able to undergo the sex offender treatment program. If the Bureau of Prisons is not able to accede to that recommendation, Mr. Lopata

8

requests that the Court recommend that his sentence be served at **FCI Danbury** which also has a sex offender treatment program. In addition, both the locations of both facilities would make it easier for Mr. Lopata to have visits from family and friends.

                                          Respectfully submitted,

                                          ROSS LOPATA

                                          /s/ *William J. O'Neil*
                                          WILLIAM J. O'NEIL
                                          Attorney for the Defendant
                                          280 N. Main St., Ste. 6
                                          East Longmeadow, MA 01028
                                          (413) 224-2694
                                          BBO#:548445

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

November 4, 2021                              /s/ *William J. O'Neil*
                                                William J. O'Neil